# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: LEVAQUIN PRODUCTS LIABILITY LITIGATION, | MDL No. 08-1943 (JRT) |

**This Document Relates to:**

**Civil No. 06-3728 (JRT)**

WILLIAM VOSS, SHARON JOHNSON,
and HAROLD WAMPLER,

                       Plaintiffs,

**Civil No. 07-1862 (JRT)**

RICHARD KIRKES, WILLIAM
LAUFENBERG, and BILLIE JOHNSON,

                       Plaintiffs,

**Civil No. 07-3960 (JRT)**

CALVIN CHRISTENSEN, EDWARD
KARKOSKA, JERRY CULLINS, and
WILFRED DELUDE,

                       Plaintiffs,

**Civil No. 08-5743 (JRT)**

JOHN SCHEDIN,

                       Plaintiff,

**Civil No. 08-5745 (JRT)**

EUGENE MARTINKA,

                       Plaintiff,

v.

JOHNSON & JOHNSON; ORTHO-MCNEIL
PHARMACEUTICAL, INC.; JOHNSON &
JOHNSON PHARMACEUTICAL
RESEARCH & DEVELOPMENT, LLC; and
ORTHO-MCNEIL-JANSSEN
PHARMACEUTICALS, INC.;

                       Defendants.

**MEMORANDUM OPINION
AND ORDER GRANTING IN PART
AND DENYING IN PART
DEFENDANTS' MOTION FOR
PARTIAL JUDGMENT ON THE
PLEADINGS**

Ronald S. Goldser, **ZIMMERMAN REED, PLLP**, 651 Nicollet Mall, Suite 501, Minneapolis, MN 55402-4123; and Lewis J. Saul, **LEWIS SAUL & ASSOCIATES**, 183 Middle Street, Suite 200, Portland, ME 04101, co-lead counsel for plaintiffs.

Tracy J. Van Steenburgh, **NILAN JOHNSON LEWIS, PA**, 400 One Financial Plaza, 120 South Sixth Street, Minneapolis, MN 55402; William H. Robinson, Jr., **LECLAIR RYAN**, 1100 Connecticut Avenue N.W., Suite 600, Washington, DC 20036; and John Dames, **DRINKER BIDDLE & REATH LLP**, 191 North Wacker Drive, Suite 3700, Chicago, IL 60606-1698; liaison and lead counsel for defendants.

The instant motions concern the cases of five plaintiffs ("Phase 1 Minnesota plaintiffs" or "plaintiffs") whose actions have been consolidated with hundreds of other cases in this multidistrict litigation. Plaintiffs assert injuries resulting from the use of Levaquin, an antibiotic medication.

Defendants have filed substantively identical joint motions for partial judgment on the pleadings in the following cases: *Schedin v. Johnson & Johnson, et al.*, Civil No. 08-5743 (D. Minn. filed Oct. 15, 2008) (Schedin Docket No. 19)[1]); *Christensen v. Johnson & Johnson, et al.*, Civil No. 07-3960 (D. Minn. filed Sept. 12, 2007) (only as to plaintiffs Calvin Christensen and Edward Karkoska) (Christensen Docket No. 79); *Voss, et al. v. Johnson & Johnson, et al.*, Civil No. 06-3728 (D. Minn. filed Sept. 15, 2006) (only as to plaintiff Sharon Johnson) (Voss Docket No. 116); *Kirkes, et al. v. Johnson & Johnson, et al.*, Civil No. 07-1862 (D. Minn. filed Apr. 11, 2007) (only as to plaintiff Richard Kirkes) (Kirkes Docket No. 106); and *Martinka v. Johnson & Johnson, et al.*, Civil No.

---

[1] Record citations references to the specific dockets in individual cases by identifying the last name of the first listed plaintiff. For example, citations to *Schedin v. Johnson & Johnson*, Civ. No. 08-5743 (D. Minn. filed Oct. 15, 2008) are noted as "Schedin Docket No."

08-5745 (D. Minn. filed Oct. 15, 2008) (Martinka Docket No. 19).  For the reasons stated below, the Court grants in part and denies in part defendants' motions.

## BACKGROUND[2]

"When evaluating a motion for judgment on the pleadings, a court must accept as true all factual allegations set out in the complaint, and must construe the complaint in the light most favorable to the plaintiff, drawing all inferences in his favor."  *Wishnatsky v. Rovner*, 433 F.3d 608, 610 (8th Cir. 2006) (citation omitted).  With that standard in mind, the Court summarizes plaintiffs' allegations as follows.

Levaquin, defendants' brand name for the antibiotic levofloxacin, is a broad spectrum synthetic antibacterial agent.    (Compl. ¶ 15, Schedin Docket No. 1.)   It is approved for use in the treatment of a variety of upper respiratory infections, urinary tract infections, prostatitis, and other bacterial infections.  (*Id.*)  Levofloxacin is part of a class of antibiotics, including ciprofloxacin (Cipro) and ofloxacin (Floxin), known as fluoroquinolones. (*Id.* ¶ 16.)   Although considered highly effective at killing certain bacteria, fluoroquinolones are also associated with serious side effects including tendon injuries.  (*Id.* ¶¶ 17, 4-5.)   Medical research suggests that the risk of tendon injury is increased in patients over age sixty and those concurrently using corticosteroids.  (*Id.* ¶¶ 27, 37.)

---

[2] For ease of reference, the Court relies on the allegations in Schedin's complaint as illustrative of the allegations common to the Phase 1 Minnesota plaintiffs and relevant to the instant motions.  Allegations specific to a particular plaintiff's complaint are noted where appropriate.

Levofloxacin is a successor drug to ofloxacin and is pharmacologically similar. (*Id.* ¶¶19, 23-25.) Floxin was highlighted in medical literature as one of the most tendon toxic fluoroquinolones. (*Id.* ¶¶ 29-30, 35, 37.) In 2001, several European regulatory authorities began to consider a heightened warning for levofloxacin's label in response to medical research and post-market experiences with the drug. (*Id.* ¶ 71.) Specifically, plaintiffs allege that the European Agency for the Evaluation of Medicinal Products considered levofloxacin the most tendon toxic of the fluoroquinolones and proposed a label warning that would warn of its comparatively greater toxicity. (*Id.* ¶ 72.) According to plaintiffs, despite knowledge of Levaquin's heightened risks, defendants failed to adequately alert the medical community. (*Id.* ¶ 64.)

When Levaquin first entered the U.S. market in 1997, its label included the warning that the FDA required for all fluoroquinolones as a class:

> Ruptures of the shoulder, hand and Achilles tendons that required surgical repair or resulted in prolonged disability have been reported with [fluoroquinolones]. [Levaquin] should be discontinued if the patient experiences pain, inflammation, or rupture of a tendon. . . . Tendon rupture can occur at any time during or after therapy with [Levaquin].

(Compl. ¶¶ 44-45, Schedin Docket No. 1.) Plaintiffs allege that this warning was inadequate; it was, among other insufficiencies, buried in a long list of potential adverse reactions and lacking any indication of an increased risk of tendon injury in the elderly or corticosteroid users. (*Id.* ¶ 45.)

According to plaintiffs, in 2001 defendants began crafting an epidemiology study ("the Ingenix Study") regarding tendon rupture and fluoroquinolones that diverged from other published studies on the issue in an ultimately successful attempt to forestall and

even prevent European regulatory action that would have negatively affected levofloxacin sales in both Europe and the United States.  (*Id.* ¶¶ 74-76.)  Plaintiffs allege that this study – co-authored and funded by defendant Johnson & Johnson Pharmaceutical Research & Development – was deeply flawed and manipulated to produce favorable result.  (*Id.* ¶¶ 82-88.)

In 2002, defendants embedded an additional warning in Levaquin's label: "Post-marketing surveillance reports indicate that this risk may be increased in patients receiving concomitant corticosteroids, especially in the elderly."  (*Id.*  ¶ 65.)  Plaintiffs assert that this warning change inadequately informed their target patient population – the elderly – that they were at an increased risk of tendon injury by "flipping the confounders."  (*Id.* ¶ 68.)  Pursuant to the 2002 warning, plaintiffs allege, "any elderly person not on corticosteroids . . . had no additional risk of a tendon injury, and the fact that the warning was so equivocal regarding corticosteroids diffused any possible effect of warning physicians of the effect of age on the frequency and severity of this debilitating injury." (*Id.*)

Levaquin became the most prescribed fluoroquinolone in the United States in 2003, and the most prescribed antibiotic in the world in 2006.  (*Id.* ¶ 95.)  Levaquin's increased popularity, plaintiffs allege, corresponded with an increase in reported tendon related injuries.  (*Id.* ¶ 96.)  Reports of tendon injuries associated with Levaquin to the Food and Drug Administration ("FDA") in the six year period of 1997 through 2005 exceeded reports of tendon injuries associated with **all** pre-Levaquin fluoroquinolones in the ten year period of 1985 through 1995.  (*Id.* ¶ 94.)

In February 2005, John Schedin, then seventy-seven years old, consumed Levaquin prescribed for an upper respiratory infection. (*Id.* ¶ 108.) After using Levaquin for approximately eight days, Schedin suffered partial, bilateral Achilles tendon tears. (*Id.*) Schedin alleges that these injuries were Levaquin-induced, and that as a result of the tears, his ability to perform normal daily tasks has been compromised and his quality of life has been severely diminished." (*Id.*)

In April 2007, at the FDA's request, defendants again changed the label for Levaquin. (*Id.* ¶ 101.) Plaintiffs concede that the 2007 label clearly stated the elderly are at an increased risk of tendon injury, and unequivocally stated that the risk of tendon injuries is increased with concomitant use of corticosteroids, contrary to the results of defendants' Ingenix study. (*Id.*) According to plaintiffs, defendants "negotiated with the FDA and insisted on a class warning [for all fluoroquinolones] to thereby minimize the heightened risk of tendon injury with Levaquin" as compared to other fluoroquinolones. (*Id.* ¶ 102.)

On July 8, 2008, the FDA required defendants and other fluoroquinolone manufacturers to add a black box warning and medication guide to the prescribing information for Levaquin and other fluoroquinolones. (*Id.* ¶ 105.) Plaintiffs allege that although the black box warning indicates that the risk of tendinitis and tendon rupture is further increased in patients over sixty, **Levaquin's current label is still inadequate**. (*Id.* ¶ 106.) Specifically, it does not warn health care providers that Levaquin is much more tendon toxic than other fluoroquinolones and that the label will therefore mislead physicians regarding the relative risk of a Levaquin-induced tendon injury. (*Id.* ¶ 106.)

Plaintiffs allege that Levaquin is defective in design because of its propensity to cause tendon ruptures and other serious tendon injuries. (*Id.* ¶ 115.) They further assert that Levaquin is unreasonably dangerous because it was sold without adequate warnings including information regarding:

> the propensity of Levaquin to cause serious tendon injuries; the post-marketing experience with Levaquin; the increased risk of tendon injury in patients over the age of 60; the numbers of tendon-related adverse events reported; and the probability of suffering an acute tendon injury when ingesting corticosteroids concomitantly with Levaquin or post-Levaquin use.

(*Id.* ¶ 116.) Plaintiffs seek relief including damages for past and future medical expenses and emotional harm, double or treble damages, disgorgement of profits, and a full refund of cost of all Levaquin prescriptions. (*Id.* at 42.)

Plaintiffs have asserted common law claims including strict liability, negligence, and fraud, as well as claims under several Minnesota statutes. In the instant motions, defendants seek dismissal of eight of plaintiffs' claims. Specifically, they seek dismissal of claims arising under Minnesota's Unfair Trade Practices Act ("UTPA") (Schedin Count 6), Consumer Fraud Act ("CFA") (Schedin Count 8), False Advertising Act ("FAA") (Schedin Count 9), and Senior Citizen and Handicapped Person Consumer Fraud Act ("SCHPCFA") (Schedin Count 7) on the grounds that plaintiffs do not meet the public benefit element these statutes require. Defendants have also moved for judgment on the pleadings on plaintiffs' Minnesota Deceptive Trade Practices Act ("DTPA") claim (Schedin Count 7) on the grounds that it provides only for injunctive

relief which plaintiffs do not seek.[3]  In addition, defendants have moved for judgment on

the pleadings with regard to plaintiffs' claims for breach of express and implied warranty

(Schedin Counts 3 and 4) and unjust enrichment (Schedin Count 10).

## ANALYSIS

## I.        STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide that any party may move for

judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to

delay the trial . . . ." Fed. R. Civ. P. 12(c).  Judgment on the pleadings is appropriate only

where, accepting as true all factual allegations set forth in plaintiffs' complaints and

granting them all reasonable inferences, "no material issue of fact remains to be resolved

and the movant is entitled to judgment as a matter of law." *Faibisch v. Univ. of Minn.*,

304 F.3d 797, 803 (8th Cir. 2002).

The Court reviews a Rule 12(c) motion under "the same standard used to address a

motion to dismiss for failure to state a claim under Rule 12(b)(6) . . . ." *Ashley Cnty.,*

*Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).  For a plaintiff to survive a motion

to dismiss, the complaint need not contain "detailed factual allegations," but it must set

forth facts with sufficient specificity "to raise a right to relief above the speculative level

---

[3] Minnesota courts have consistently concluded that the DTPA affords only prospective injunctive relief, which plaintiffs do not seek.  *See, e.g., Cannon Techs., Inc. v. Sensus Metering Sys., Inc.*, Civ. No. 08-6456, 2010 WL 3418385, at *12 (D. Minn. Aug. 19, 2010) ("It is well-settled that monetary damages are not available" under the DTPA); *State ex rel. Hatch v. Cross Country Bank, Inc.*, 703 N.W.2d 562, 573 (Minn. Ct. App. 2005).  The DTPA applies only to individuals "**likely to be damaged** by a deceptive trade practice[.]"  Minn. Stat. § 325D.45, subd. 1 (emphasis added).  Plaintiffs here seek redress only for past injuries.  At oral argument, plaintiffs' counsel withdrew the DTPA claims.  Accordingly, the Court **denies as moot** this aspect of defendants' motions.

. . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (quotation omitted).

## II.    CLAIMS UNDER THE UTPA, CFA, AND THE FAA

Defendants first challenge plaintiffs' claims under various Minnesota consumer protection statutes. *See* Minn. Stat. §§ 325D.13 (UTPA), 325F.69 (CFA), 325F.67 (FAA). None of these three statutes provide for a private cause of action. *See Wehner v. Linvatech Corp.*, No. 06-CV-1709, 2008 WL 495525, at *3 (D. Minn. Feb. 20, 2008). Under Minnesota's Private Attorney Statute ("Private AG Statute"), however, "any person injured by a violation" of the laws entrusted to the Minnesota Attorney General to investigate and enforce – including the UTPA, CFA, and the FAA – may file suit and recover damages as well as costs and attorney fees. Minn. Stat. § 8.31, subd. 3a. By providing an incentive to encourage defrauded consumers to file suit, the Private AG Statute "advances the legislature's intent to prevent fraudulent representations and deceptive practices with regard to consumer products . . . ." *Ly v. Nystrom*, 615 N.W.2d 302, 311 (Minn. 2000).

"Since the Private AG Statute grants private citizens the right to act as a 'private' attorney general, the role and duties of the attorney general with respect to enforcing the fraudulent business practices laws must define the limits of the private claimant under the statute." *Id.* at 313. The attorney general is not responsible for protecting "private or individual interests independent of a public purpose." *Id.* Accordingly, in *Ly* the Minnesota Supreme Court concluded that "the Private AG Statute applies only to those

claimants who demonstrate that their cause of action benefits the public." *Id.* at 314.

Therefore, plaintiffs must show a public benefit in order to bring claims under **any Minnesota law** that does not provide an independent private right of action but is covered by the Private AG Statute. *See, e.g.*, *Wehner v. Linvatech Corp.*, No. 06 -CV-1709, 2008 WL 495525, at *3 (D. Minn. Feb. 20, 2008) (granting summary judgment to defendant on claims under the UTPA, CFA, and FAA that did not benefit the public); *Davis v. U.S. Bancorp*, No. 02-505, 2003 WL 21730102, at *4 (D. Minn. July 23, 2003) (granting summary judgment to defendant on claims "for personal benefit only" based on the Minnesota Mortgage Originator and Servicer Licensing Act, Minn. Stat. § 58.13, the CFA, and the Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44).

"To determine whether a lawsuit is brought for the public benefit the Court must examine not only the form of the alleged misrepresentation, but also the relief sought by the plaintiff." *Zutz v. Case Corp.*, No. 02-1776, 2003 WL 22848943, at *4 (D. Minn. Nov. 21, 2003). Courts consistently focus their inquiry on the relief sought by the plaintiff, and find no public benefit where plaintiffs request only damages even when plaintiffs are suing for injuries resulting from mass produced and mass marketed products as the Phase 1 Minnesota plaintiffs are here.[4] *See, e.g.*, *Overen v. Hasbro, Inc.*, No. 07-1430, 2007 WL 2695792, at *3 (D. Minn. Sept. 12, 2007); *Berczyk v. Emerson Tool Co.*, 291 F. Supp. 2d 1004, 1020 (D. Minn. 2003); *Zutz*, 2003 WL 22848943, at *4; *Pecarina v. Tokai Corp.*, No. 01-1655, 2002 WL 1023153, at *5 (D. Minn. May 20, 2002).

---

[4] Plaintiffs are also seeking disgorgement of profits which, they argue, may be characterized as an equitable remedy. Regardless, they have not explained how disgorgement of profits will benefit the public generally.

Defendants argue that since plaintiffs seek only damages resulting from prior Levaquin labels – subsequently replaced by a label with a stronger warning to address alleged deficiencies – their lawsuit is of no public benefit.

As this Court has explained, however, the fact that a plaintiff requests no injunctive relief "does not preclude either party from satisfying the public benefit requirement." *ADT Sec. Servs., Inc. v. Swenson, ex rel. Estate of Lee*, 687 F. Supp. 2d 884, 892 (D. Minn. 2009). Indeed, a request for injunctive relief does not necessarily establish a public benefit. *See, e.g.*, *Jensen v. Duluth Area YMCA*, 688 N.W.2d 574, 578 (Minn. Ct. App. 2004) (plaintiff seeking equitable relief of reinstatement of YMCA membership did not establish a public benefit because "[h]is claim relates to a single one-on-one incident that affected only him").

The other factor to consider in a public benefit inquiry – the form of the alleged misrepresentation – proved dispositive in *Collins v. Minnesota School of Business, Inc.*, 655 N.W.2d 320 (Minn. 2003). *Collins* concerned allegations by former students that a post-secondary school made "false, misleading, and confusing statements about its sports medicine program." *Id.* at 322. Plaintiffs brought both common law and statutory claims. *Id.* When the case settled, plaintiffs moved for attorney fees. *Id.*

The trial court denied the motion on the ground that plaintiffs' claims did not benefit the public as required by the Private AG Statute. *Id.* at 330. The Minnesota Supreme Court concluded that the lower court "**misapplied the holding in [*Ly*] by ignoring the fact that [the defendant] misrepresented the nature of its program to the public at large.**" *Id.* (emphasis added). Because the school in *Collins* made

misrepresentations to the public at large, the students' successful prosecution of their lawsuit benefited the public for purposes of recovering attorney fees under the Private AG Statute. *Id.*

As this Court has observed regarding *Collins*, "[n]either the Minnesota Court of Appeals nor the Minnesota Supreme Court indicated that the plaintiffs had sought injunctive relief." *ADT Sec. Servs., Inc. v. Swenson*, 2008 WL 2828867, at *6 (July 21, 2008). *See Collins*, 655 N.W.2d at 329-30; *Collins v. Minn. Sch. of Bus., Inc.*, 636 N.W.2d 816, 820-21 (Minn. Ct. App. 2001). "Nonetheless, both courts concluded that plaintiffs had sought a sufficient 'public benefit' for the purposes of the Private Attorney General Statute." *ADT Sec. Servs.*, 2008 WL 2828867, at *6.

Thus, although federal courts in Minnesota have focused the public benefit inquiry on whether plaintiff is seeking only money damages – a factor which disfavors plaintiffs here – after *Collins*, it seems reasonable to infer that the Minnesota Supreme Court[5] is as much if not more concerned with the **degree** to which defendants' alleged misrepresentations affect the public – a factor in plaintiffs' favor. *See Summit Recovery, LLC v. Credit Card Reseller, LLC*, No. 08-5273, 2010 WL 1427322, at *5 (D. Minn. Apr. 9, 2010) (concluding that under Minnesota law "[m]isleading advertising to the general public supports a finding that a claim benefits the public [while] a one-on-one misrepresentation is purely private and is not a ground for relief") (citations omitted).

---

[5] The Court is bound by the Minnesota Supreme Court's interpretation of state law. *See Hawkins Chem., Inc. v. Westchester Fire Ins. Co.*, 159 F.3d 348, 352 (8th Cir. 1998). Accordingly, the Court's interpretation of the Private AG Statute appropriately accords more deference to *Collins* than to the (unpublished) decisions of federal courts within this District.

*Ly*, after all, was a lawsuit resulting from "a single one-on-one transaction in which the fraudulent misrepresentation . . . was made only to appellant."  615 N.W.2d at 314. By contrast, Levaquin was mass marketed to the public, like the misrepresented school program in *Collins*.  The challenged label was included with every package.

Unlike the plaintiffs in *Collins*, plaintiffs do not suggest that defendants have changed their label in response to their lawsuit, at least **not yet**.  *See ADT Sec. Servs.*, 2008 WL 2828867, at *6 (citing *Collins*, 636 N.W.2d at 820); c*f. See Behrens v. United Vaccines, Inc., Div. of Harlan Sprague Dawley, Inc.*, 228 F. Supp. 2d 965, 968, 970 (D. Minn. 2002) (considering defendants' argument that "the Plaintiffs cannot responsibly contend, as did the plaintiffs in *Collins,* that, 'but for' their lawsuit, the Defendant would have continued to make false representations about that product to the public's disadvantage" and concluding that plaintiff's lawsuit seeking only money damages did not benefit the public).  As defendants argue, plaintiffs' injuries are based on the alleged inadequacies of older Levaquin warnings which have been replaced by a stronger black box warning at the insistence of the FDA.  Plaintiffs' suit cannot therefore directly result in the removal of Levaquin from the market or the strengthening of its label to reflect its comparatively higher tendon toxicity relative to other fluoroquinolones.

The Court finds, however, that as in *Collins* and *ADT Sec. Servs.*, this lawsuit may indirectly lead to such changes.  Plaintiffs argue that the earlier Levaquin warnings were inadequate because, among other reasons, they did not sufficiently warn that Levaquin was comparatively more tendon toxic than other fluoroquinolones.  (*See, e.g.*, Compl. ¶¶ 64, 94, 106, Schedin Docket No. 1.)  That inadequacy, they allege, is continuing.  (*See*

*id.*)  Plaintiffs' counsel reiterated this position at oral argument.  In *ADT Sec. Servs.*, this Court denied a motion to dismiss claims seeking only damages under Minnesota's consumer protection statutes where there were "no concrete indications" that the challenged practices had ceased even though the plaintiffs were not entitled to seek equitable relief.  687 F. Supp. 2d at 892 n.4; c*f. Tuttle v. Lorillard Tobacco Co.*, No. 99-1550, 2003 WL 1571584, at *6 (D. Minn. Mar. 3, 2003) ("To the extent that Plaintiff wants to warn the public of the dangers of smokeless tobacco, the FDA-required warnings already accomplish that purpose.").

Construing as true plaintiffs' allegations, as we must do on a motion for judgment on the pleadings, Levaquin is currently a dangerous drug marketed to the public with inadequate warnings.  (*See, e.g.*, Compl. ¶¶ 115, 133, Schedin Docket No. 1.)  This lawsuit may indirectly cause defendants to redress a public safety hazard, a result of obvious benefit to the public under the Private AG Statute.  As plaintiffs have alleged ongoing threats to public safety, the Court denies defendants judgment on the pleadings with regard to plaintiffs' claims under the UTPA, CFA, and the FAA.

## III.  CLAIMS UNDER THE SCHPCFA

The SCHPCFA provides for an additional civil penalty in certain circumstances if the conduct prohibited by the UTPA, CFA, and FAA is perpetrated against senior citizens.  *See* Minn. Stat. § 325F.71 subds. 1(a), 2(a).  The parties agree that plaintiffs' SCHPCFA claims stand or fall with their claims under the other Minnesota consumer protection statutes.  *See Beck ex rel. Beck v. Sunrise Senior Living Mgmt., Inc.*, No. 080-

28, 2008 WL 3412096, at *2 (D. Minn. Aug. 8, 2008) (dismissing SCHPCFA claim where plaintiff's CFA claim sought no public benefit). Defendants are not entitled to judgment on the pleadings as to the SCHPCFA claims for the same reasons they are not entitled to judgment on the pleadings as to the other statutory consumer protection statutes.

However, the SCHPCFA claim of plaintiff Sharon Johnson, to the extent she asserts one, must be dismissed. Johnson was approximately fifty-five years old when she was prescribed Levaquin. (Compl. ¶¶ 116, 185-194, Voss Docket No. 70.) The SCHPCFA applies only to individuals sixty-two years of age or older. Minn. Stat. § 325F.71, subd. 1(a). Accordingly, the Court grants defendants' motion for judgment on the pleadings with regard to Sharon Johnson's SCHPCFA claim but denies defendants' motion with regard to the other Phase 1 Minnesota plaintiffs.

## IV. CLAIMS FOR BREACH OF IMPLIED WARRANTY

Plaintiffs allege that defendants breached the implied warranty of merchantability because Levaquin is neither of merchantable quality nor safe for its intended use in that Levaquin has the propensity to cause tendon rupture and other debilitating tendon injuries, and bodily harm." (Compl. ¶ 133, Schedin Docket No. 1.)

Under Minnesota law, "[s]trict products liability has effectively preempted implied warranty claims where personal injury is involved." *Masepohl v. Am. Tobacco Co., Inc.*, 974 F. Supp. 1245, 1253 (D. Minn. 1997) (alteration in original) (quoting *Nimeth v. Prest Equip. Co.*, No. C1-93-685, 1993 WL 328767, at *1 (Minn. Ct. App. Aug. 31, 1993)); *see*

*also Kladivo v. Sportsstuff, Inc.,* No. 06-4924, 2008 WL 4933951, at *4 (D. Minn. Sept. 2, 2008).

Defendants have not moved for judgment on the pleadings as to plaintiffs' strict liability or negligence claims. Plaintiffs may proceed to trial on either theory, although they may only submit the case to the jury on the basis of one. *See Hauenstein v. Loctite Corp.*, 347 N.W.2d 272, 275 (Minn. 1984), Plaintiffs' claims for breach of the implied warranty of merchantability, however, are subsumed by their strict liability claims and warrant dismissal. The Court grants defendants judgment on the pleadings as to plaintiffs' claims for breach of the implied warranty of merchantability.

## V.  CLAIMS FOR BREACH OF EXPRESS WARRANTY

Defendants challenge plaintiffs' claims for breach of express warranty on two grounds. First, they argue that they merge into plaintiffs' claims for breach of the implied warranty of merchantability, which is in turn redundant of either their strict liability claims or their negligence claims. Second, defendants argue that plaintiffs' claims for breach of expressed warranty must fail because plaintiffs have not identified language creating a warranty.

An express warranty is created when "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain" or "[a]ny description of the goods . . .is made part of the basis of the bargain." Minn. Stat. § 336.2-313(1)(a), (b). "To establish a warranty claim the plaintiff must basically prove: the existence of a warranty, a breach, and a causal link between the

breach and the alleged harm." *Peterson v. Bendix Home Sys., Inc.*, 318 N.W.2d 50, 52-53 (Minn. 1982). Plaintiffs allege that through their marketing program, promotional activities, and other written and verbal assurances, defendants made express warranties to plaintiffs and/or their physicians that scientific studies showed that Levaquin was safe for its intended use." (Compl. ¶ 136, Schedin Docket No. 1.) Defendants' "promotional campaign[,]" according to plaintiffs, "was themed on Levaquin's excellent safety profile and failed to disclose the risks of tendon injury." (*Id.* ¶ 50.)

Defendants rely on *Leedahl v. Rayco Mfg., Inc.*, No. 06-310, 2006 WL 1662959 (D. Minn. May 15, 2006), an unpublished Report and Recommendation (adopted June 14, 2006), for the proposition that a claim for breach of an express warranty that a product is suitable for ordinary use is equivalent to a claim for breach of the implied warranty of merchantability under Minnesota law. *See id.* at *4 (citing *Farr v. Armstrong Rubber Co.*, 179 N.W.2d 64, 70-71 (Minn. 1970)). The cited section of *Farr*, however, addresses the distinction between a claim for strict liability and the implied warranty of merchantability. *See* 179 N.W.2d at 70-71.

In *Farr*, the Minnesota Supreme Court characterized a retailer's single statement that a truck's tires would be adequate as "nothing more than a reaffirmance of what is required under an implied warranty of merchantability, that is, fitness for the ordinary purposes for which such goods are used." 179 N.W.2d at 72. That characterization, however, was in the context of the court's consideration of the individual wrongdoing of the retailer to determine whether he was entitled to indemnity by the tire's manufacturer – not whether a claim for breach of the implied warranty of merchantability subsumed a

claim for express warranty.  *See id.*  Here, in contrast to the retailer's statement in *Farr* and the absence of express promises about the qualities of the product in *Leedahl*, defendants allegedly made affirmative, specific, and untrue warranties regarding scientific research, the occurrence of adverse events, and Levaquin's safety profile.

In another recent unpublished decision, this Court denied a motion to dismiss a claim for breach of express warranty based on the allegation that the defendant "through its authorized dealers, agents and marketing materials warranted that [its] vehicles were merchantable and fit for ordinary purposes of use."  *Daigle v. Ford Motor Co.*, No. 09-3214, 2010 WL 1875521, at *2 (D. Minn. May 10, 2010) (quotations omitted); *see id.* (concluding that "[t]his allegation rises beyond a mere recitation of the elements of the claim and describes with specificity possible sources of representation upon which the vehicle buyers may rely").  Generally, "[w]hether a given representation constitutes a warranty is ordinarily a question of fact for the jury."  *Crothers by Crothers v. Cohen*, 384 N.W.2d 562, 563 (Minn. Ct. App. 1986); *see also id.* at 564 (concluding that a statement that a car was a "good runner" could constitute an express warranty).

Following the logic of *Leedahl*, *Farr*, and *Daigle*, plaintiffs' allegations of instances in which an express warranty was made are sufficiently specific to survive a motion for judgment on the pleadings.  (*See, e.g.*, Compl. ¶ 50 (promotional campaign "themed on Levaquin's excellent safety profile"); ¶51 ("Defendants . . . assert[ed] that Levaquin had been prescribed frequently with few adverse events."); ¶52 ("[O]ne such advertisement boasted that Levaquin had 'An Outstanding Record of Safety' as '[o]ver 63,000,000 patients worldwide' had taken the drug and only diarrhea and nausea had

shown up as adverse effects, albeit rarely."), Schedin Docket No. 1.)  The Court denies

defendants' motion for judgment on the pleadings as to plaintiffs' claims for breach of

express warranty.


## VI.  CLAIMS FOR UNJUST ENRICHMENT

Plaintiffs seek "the disgorgement and restitution of Defendants' wrongful profits,

revenues and benefits" based on defendants' alleged unjust enrichment from their

"conscious wrongdoing . . . ."  (*Id.* ¶ 195.)  "A party may not have equitable relief where

there is an adequate remedy at law available."  *ServiceMaster of St. Cloud v. GAB Bus.

Servs., Inc.*, 544 N.W.2d 302, 305 (Minn. 1996).  As defendants argue, plaintiffs can

attain adequate relief through their multitude of tort claims.

In *Daigle*, however, the court permitted simultaneous pleadings of breach of

warranty and unjust enrichment claims "on the grounds that, under Federal Rule of Civil

Procedure 8(d), a party is permitted to plead in the alternative."  2010 WL 1875521, at

*5; *see also LePage v. Blue Cross & Blue Shield of Minn.*, No. 08-584, 2008 WL

2570815, at *8 (D. Minn. June 25, 2008) (permitting plaintiff to proceed with unjust

enrichment claim despite adequate remedy at law because "a party may plead alternative

theories of relief under both legal and equitable grounds").  *But see Arena Dev. Grp.,

LLC v. Naegele Commc'ns, Inc.*, No. 06-2806, 2007 WL 2506431, at *11 (D. Minn.

Aug. 30, 2007) (rejecting plaintiffs' argument that "if their fraudulent transfer claims fail,

they will not have an adequate remedy at law, making their unjust enrichment claim

viable").

The particular holdings of *ServiceMaster* and other state law cases cited by defendants are that a plaintiff who **chooses not to pursue available remedies at law** cannot recover under principles of equity. *See* 544 N.W.2d at 306 ("[Unexercised] lien rights were adequate remedies that would bar ServiceMaster's claims for equitable relief . . . ."); *see also Southtown Plumbing, Inc. v. Har-Ned Lumber Co., Inc.,* 493 N.W.2d 137, 140 (Minn. Ct. App. 1992) ("Because [plaintiffs] had a statutory remedy and **chose not to enforce it**, they cannot make out an equitable claim for unjust enrichment." (emphasis added)); *Mon-Ray, Inc. v. Granite Re, Inc.*, 677 N.W.2d 434, 440 (Minn. Ct. App. 2004) ("[B]ecause the subcontractors **failed to pursue their available legal remedy**, we conclude they cannot now claim that they are entitled to equitable relief . . . ." (emphasis added)). Plaintiffs in this case clearly have chosen to pursue remedies at law and argue for equitable remedies only in the alternative as permitted by Federal Rule of Civil Procedure 8. Accordingly, the Court denies defendants' motion for judgment on the pleadings with regard to plaintiffs' claims for unjust enrichment.

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that defendants' motions for partial judgment on the pleadings [Schedin Docket No. 19, Christensen Docket No. 79, Voss Docket No. 116, Kirkes Docket No. 106, and Martinka Docket No. 19] are **GRANTED in part** and **DENIED in part** as follows:

1.      The motions are **DENIED** as to all Phase 1 Minnesota plaintiffs' claims under the Unfair Trade Practices Act, Minn. Stat. § 325D.13 [Schedin Compl. Count 6;[6] Voss Compl. Count 6; Kirkes Compl. Count 6; Christensen Compl. Count 8; Martinka Compl. Count 6].

2.      The motions are **DENIED** as to plaintiffs John Schedin, Calvin Christensen, Edward Karkoska, and Eugene Martinka's claims under the Consumer Fraud Act, Minn. Stat. § 325F.69 [Schedin Compl. Count 8; Christensen Compl. Count 7; Martinka Compl. Count 8].

3.      The motions are **DENIED** as to plaintiffs John Schedin, Calvin Christensen, Edward Karkoska, and Eugene Martinka's claims under the False Advertising Act, Minn. Stat. § 325F.67 [Schedin Compl. Count 9; Christensen Compl. Count 6; Martinka Compl. Count 9].

4.      The motions are **DENIED** as to plaintiffs John Schedin, Richard Kirkes, and Eugene Martinka's claims under the Senior Citizen and Handicapped Consumer Act, Minn. Stat. § 325F.71 [Schedin Compl. Count 7; Kirkes Compl. Count 7; Martinka Compl. Count 7].

5.      The motion is **GRANTED** as to plaintiff Sharon Johnson's claim under the Senior Citizen and Handicapped Consumer Act, Minn. Stat. § 325F.71 [Voss Compl. Count 7].  This claim is **DISMISSED with prejudice**.

---

[6] References to complaints, many of which are amended complaints, correspond with the following docket numbers: Schedin Compl., Schedin Docket No. 1; Voss Compl., Voss Docket No. 70; Kirkes Compl., Kirkes Docket No. 68; Christensen Compl., Christensen Docket No. 32; Martinka Compl., Martinka Docket No. 1.

6. Minnesota Phase 1 plaintiffs' claims under the Deceptive Trade Practices Act, Minn. Stat. § 325D.44 [Schedin Compl. Count 6; Voss Compl. Count 6; Kirkes Compl. Count 6; Christensen Compl. Count 8; Martinka Compl. Count 6] are **DISMISSED**, as withdrawn.

7. The motions are **GRANTED** as to all Minnesota Phase 1 plaintiffs' claims for breach of implied warranty [Schedin Compl. Count 3; Voss Compl. Count 3; Kirkes Compl. Count 3; Christensen Compl. Count 3; Martinka Compl. Count 3]. These claims are **DISMISSED with prejudice.**

8. The motions are **DENIED** as to all Minnesota Phase 1 plaintiffs' claims for breach of express warranty (Schedin Compl. Count 4; Voss Compl. Count 4; Kirkes Compl. Count 4; Christensen Compl. Count 4; Martinka Compl. Count 4);

9. The motions are **DENIED** as to plaintiffs John Schedin, Sharon Johnson, Richard Kirkes, and Eugene Martinka's claims for unjust enrichment [Schedin Compl. Count 10; Voss Compl. Count 8; Kirkes Compl. Count 8; Martinka Compl. Count 10].


DATED: November 8, 2010
at Minneapolis, Minnesota.

_____s/ John N. Tunheim_____
JOHN R. TUNHEIM
United States District Judge